UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

vs.                                                                          DECISION AND ORDER

ERIC CONNELLY,                                                     05-CR-6166 CJS

                    Defendant.


_____

## INTRODUCTION

        This matter is before the Court on the defendant's motion to suppress statements that

he purportedly made to law enforcement officers on March 2, 2005, and March 8, 2005,

as well as statements relating to his telephone conversations that were monitored and

recorded on March 15, 2005, March 29, 2005, and April 6, 2005. In that regard, an

evidentiary hearing was held, at which three witnesses, Connecticut State Police

Detectives James McGlynn and Jeffrey Twohill and Lieutenant James Pollard of the State

of Connecticut Department of Corrections, testified. Additionally, certain exhibits were

received into evidence. The Court has now had a chance to consider both the testimony

and exhibits. For the reasons discussed below,  defendant's application to suppress is

denied in its entirety.

**FINDINGS OF FACT**

James McGlynn ("McGlynn")  has been employed as a police officer with the Connecticut State Police since 1989, and since 1998 has been a detective with the central major crimes squad.  On March 2, 2005, pursuant to his duties with the Connecticut State Police, Detective McGlynn went to 82 Wig Hill Road in Chester, Connecticut, the residence of  the defendant, Eric Connelly ("the defendant") in connection with his investigation into the disappearance of Jason Argersinger ("Argersinger"). McGlynn was accompanied by his partner, Detective Anthony Buglioni ("Buglioni").  McGlynn and Buglioni were in plain clothes and drove an unmarked car. They arrived at the defendant's residence at about 9:00 p.m. Upon arriving, McGlynn and Buglioni approached the residence,  and McGlynn knocked on the door, which was answered by the defendant's mother, Theresa Botono ("Botono"). McGlynn and  Buglioni identified themselves as state police officers, and explained that they wanted to speak to her. Botono invited them inside and they proceeded to the kitchen area, where they were joined by the defendant and his girlfriend, Tarra Perrone ("Perrone").  McGlynn and  Buglioni identified themselves to the defendant and Perrone as state police officers, and asked the defendant if they could speak to him. The defendant responded, "Sure." McGlynn and  Buglioni did not handcuff the defendant, pat him down, or draw their guns. After the defendant indicated that he would speak to them, McGlynn, Buglioni and the defendant sat down at the kitchen table, and Botono and Perrone left the room. McGlynn and  Buglioni did not read the defendant his *Miranda* warnings. They spoke to the defendant for about a half hour, and at no time did they handcuff the defendant, place him under arrest, restrict his movement in any way, or threaten or coerce him in any fashion. Moreover, the defendant never indicated that he

did not want to speak with McGlynn and Buglioni, or that he wanted to speak to a lawyer. The defendant was cooperative and responded to the questions asked, and did not appear to be under the influence of either drugs or alcohol. After they finished their conversation with the defendant, McGlynn and Buglioni shook his hand and thanked him, and handed him a business card and told him that if he had any other information or learned anything to contact the number on the card. McGlynn and Buglioni then spoke to Botono and Perrone for a few minutes, thanked them, and left.

Jeffrey Twohill has been employed as a police officer with the Connecticut State Police since 1987, and since 1995 has been a detective with the central major crimes squad. On March 8, 2005, pursuant to his duties with the Connecticut State Police, he became involved in the investigation into Argersinger's disappearance. In connection with his participation in that investigation, on March 8, Twohill, along with his partner that day, Buglioni, went to the defendant's residence at 82 Wig Hilll Road. They were in plain clothes and driving an unmarked police vehicle. While both were armed, neither's firearm was visible. They arrived at the defendant's residence at about 12:00 p.m. Upon arriving, they knocked on the door of the residence, which was answered by the defendant. Twohill identified himself and told the defendant that he and Buglioni wished to speak to him further about the disappearance of Argersinger. The defendant responded by inviting Twohill and Buglioni inside the residence. Twohill and Buglioni did not draw their weapons, pat the defendant down, or place him under arrest. Once inside, Twohill and Buglioni spoke to the defendant and possibly his girlfriend, Perrone, for about twenty to thirty minutes. They again informed the defendant that they wished to speak to him further concerning Argersinger's disappearance, but explained that they would like to talk to him

at a more private location,  and  suggested the Deep River Resident Trooper's Office. Twohill explained that the Deep River Resident Trooper's Office was not too far from the defendant's residence. Twohill also told the defendant that  he did not have to accompany them, but that they would like to speak to him further, since  it was important that they learn what happened. The defendant expressed a concern about missing school, and Twohill told him that it would not be a problem, that he would drive him to school if necessary. The defendant then agreed to accompany Twohill and Buglioni to the Deep River Office, and the defendant and Perrone discussed her using his car. The defendant brought a backpack with him, and gave Twohill permission to look inside. Upon inspection, Twohill observed that the backback contained books and other school-related items. The defendant either sat next to Twohill in the front seat or in the rear passenger seat. Twohill's and Buglioni's vehicle was a regular 2000 Dodge Intrepid and did not have a cage separating the back from the front.

Upon arriving at the Deep River Office, which is located in the Town Hall, Twohill parked the car, and he, Buglioni, and the defendant exited the vehicle and walked up to the second floor. The defendant was not handcuffed or restrained in any way.  Twohill, Buglioni, and the defendant went into an office and sat around a desk. They were only there for a short time when Buglioni got a call on his cell phone. He then left the room for minute or so, and upon returning, informed Twohill that Joe Howenstine was at State Police Troop F, talking to other officers. He suggested to Twohill that they should see if the defendant would be willing to go to Troop F, since they and the offficers talking to Howenstine would then be all together instead of having to communicate by phone, and also since the Town Hall  was noisier than anticipated. Twohill  explained this to the

defendant, who responded, "I'll go." Twohill, Buglioni, and the defendant then left the Deep River Office, where they had been for about ten minutes, and drove to Troop F.

Upon their arrival at Troop F, which is a two story building, Twohill, Buglioni, and the defendant went to Twohill's office in the Detective Division on the second floor. The defendant was not patted down or handcuffed, and remained free to leave. Once inside his office, Twohill specifically told the defendant that he was not under arrest. The defendant then volunteered that he was involved in the whole mess and he wanted to tell his side of it. In response, Twohill indicated to the defendant that he could use the phone in the office to call an attorney if he wanted, and added that if the defendant did not know who to call, he could use the telephone book to look someone up. The defendant, however, declined to call an attorney. Twohill proceeded to explain to the defendant that his laptop was right next to him, and that as they spoke he was going to type what the defendant told them, so the defendant could then read it over to ensure it was accurate and make any needed changes. The defendant agreed to doing this.

Prior to actually beginning the interview, Twohill had someone bring in pizza and soda, and he, Buglioni, and the defendant had something to eat. Twohill and the defendant then began to talk, and, after a few minutes, when the defendant began to speak about his role in the disappearance of Argersinger, Twohill began typing on his laptop. The defendant was at Troop F for approximately two hours, during which time the defendant used the bathroom unaccompanied by anyone. The written statement was started at 1:45 p.m. and completed at 3:00 p.m. In that regard, after he finished typing on his laptop what the defendant told him, Twohill printed the statement, read it to the defendant in Buglioni's presence, and gave it to the defendant to read, which he appeared to do. This three-page

statement, received into evidence as Exhibit # 1, after indicating the defendant's name,

address, date of birth, and social security number, contains the following pre-printed

language:

> I, Eric J. Connelly, . . . make the following statement, without fear, threat or promise, knowing that it may be used against me in court. I have been advised of my right to remain silent, that I have a right to consult with an attorney prior to any questioning and to have the attorney present during the questioning; that if I do talk to the police, I can terminate the questioning at any time; that if cannot afford an attorney, one will be appointed for me by the court. I understand the above rights and, at this time, waive them. I have been advised that my statement(s) made herein which I do no [sic] believe to be true, and which statement is intended to mislead a public servant in the performance of his/her official function, is a crime under C.G.S. section 53a-157.

When reading the statement to the defendant, Twohill read this portion as well. However,

prior to this time, Twohill had not advised the defendant of his *Miranda* rights. After giving

the defendant the opportunity to read the statement, Twohill said to him, "Do you swear it's

the truth," to which the defendant responded, "Yes." The defendant then signed the

statement, and Twohill and Buglioni witnessed his signature. At no time on March 8, 2005,

did the defendant ever indicate to Twohill or  Buglioni that he wanted a lawyer or that he

did not want to speak to them anymore. Further, on that day the defendant did not appear

to be under the influence of alcohol or drugs.

After the defendant completed the statement, Twohill drove him home. Prior to

driving him home, Twohill let the defendant use his cell phone so he could call Perrone.

The defendant was not placed under arrest on March 8, 2005.

James Pollard ("Pollard") has been employed by the State of Connecticut

Department of Corrections ("Corrections") since 1993. He currently holds the rank of

Lieutenant. In  2000, he became a telephone monitor for Corrections, and since 2004, he

has been in charge of overseeing the Corrections telephone monitoring system. In his current position, Pollard is familiar with the regulations of the State of Connecticut governing the ability of correction facilities to record inmate calls. In that regard, Administrative Directive Number 10.7, captioned Inmate Communications, states in pertinent part:

> 5.      Telephone Access. Each Facility Administrator shall provide "collect call only" telephones which allow for outgoing calls in areas specified by the Unit Administrator for inmate use.  Schedules and terms for telephone use shall be posted in telephone areas. Inmate use of "collect call only" telephones shall be deemed a privilege and not an entitlement.  Use of any telephone may be prohibited by the Facility Administrator in accordance with Administrative Directives 6.14, Security Risk Groups and 9.5, Code of Penal Discipline or to meet any valid penological interest.   If the call is to an attorney, such prohibition shall be based upon a determination relating to the maintenance of security, safety or orderly operation of the facility. The availability or use of any telephones may be restricted or terminated at the discretion of the Commissioner or designee. Inmates shall not have access to use any facility telephone, other than a "collect call only" telephone, except as authorized in this Directive.

> D.      Recording and Listening to "Collect Call Only" Telephone Calls.

> Only telephone calls from "collect call only" telephones may be recorded and listened to provided the following provisions are complied with:

> 1.      Notification. A sign in English and Spanish shall be posted at each inmate telephone location which reads: "Any conversation utilizing these telephones shall be subject to recording and listening."
> Upon admission, each inmate shall be given a form stating that the inmate's telephone calls are subject to recording and listening.  The inmate shall acknowledge reading the form by a legible printed name and signature or by an appropriate assent acknowledged in writing by a staff member. Any inmate not so consenting shall not be allowed use of the "collect call only" telephones and shall be instructed that any such use shall be unauthorized and in violation of institutional rules.

> 3.      Listening. Listening shall be authorized only by the Unit Administrator or higher authority when there is reason to believe that such listening is reasonably related to the maintenance of the security, good order or discipline of the facility or the prevention of criminal activity either within

the facility or without.

Subsection 3 applied to the defendant, since upon intake, he was classified as a high security risk  based upon the fact that his bond was a million dollars. Initially, the defendant was housed at the Hartford Correctional Facility ("Hartford"). On March 10, 2005, in connection with his incarceration at Hartford, he signed an "Inmate Telephone System Enrollment Form," received into evidence as Exhibit # 2. In relevant part it states: "From 'collect call only' telephones: Out going calls from 'collect call only' telephones, including the number called, shall be recorded and listened to."

As applied to the defendant, who because of his million-dollar bail figure was classified as a high security risk, this meant that all his non-privileged calls were required to be placed  via a collect call system and were automatically recorded. The defendant remained housed at Hartford for only a few days. Since he was considered a high security risk, he was transferred to the MacDougal-Walker Correctional Facility ("MacDougal-Walker"). As part of the booking process at MacDougal-Walker, on March 16, 2005, the defendant signed a document captioned "Notification and Acknowledgement for Inmates," which was received into evidence as Exhibit # 4.  The  second paragraph of this document reads: "From 'Collect Call Only' Telephones: Out going calls from 'collect call only' telephones, including the number called, shall be recorded and listened to." Upon arriving at MacDougal-Walker the defendant was provided an "Inmate Handbook," received into evidence as Exhibit # 6. Regarding receipt of the handbook, the defendant signed an acknowledgment form, received into evidence as Exhibit # 5. Subparagraph B of section 11, located on page 42 of the handbook states: "Recording and Listening Your telephone conversations are subject to being recorded and listened to. Conversations that violate

state regulations may be the basis of criminal or disciplinary action."

A call report for March 15, 2005, received into evidence as the first page of Exhibit # 7, indicates that the defendant, who is identified on the report by his unique six-digit personal identification number, placed a collect call on March 15, 2005, at 7:46:25 p.m., while housed at Hartford,  that lasted 14 minutes and 18 seconds. The call was placed from phone station # 3 in the south block of Hartford. A CD was received into evidence as Exhibit # 7A and includes the recording of the conversation. The recorded conversation is preceded by the following prerecorded warning: "This call originates from a  Connecticut Department of Corrections Facility and may be recorded or monitored."

A second call report, received into evidence as the second page of Exhibit # 8, indicates that the defendant, who is again identified on the report by his unique six-digit personal identification number,  placed a collect call on March 29, 2005 at 8:09:43 p.m., while housed at MacDougal-Walker,  that lasted 11 minutes and 51 seconds. This call was placed from phone station # 13 at MacDougal-Walker. A CD was received into evidence as Exhibit # 8A and includes the recording of this conversation As with Exhibit # 7A, this recorded conversation is preceded by the following prerecorded warning: "This call originates from a  Connecticut Department of Corrections Facility and may be recorded or monitored."

A third call report received into evidence as the first  page of Exhibit # 8 indicates that the defendant, who is once more identified on the report by his unique six-digit personal identification number, placed another collect call on April 6, 2005, at 4:59:59 p.m., while housed at MacDougal-Walker,  that lasted 18 minutes and 13 seconds. This call was placed from phone station 14 at MacDougal-Walker. The CD, referred to above, that  was

introduced into evidence as Exhibit # 8A , also includes the recording of the conversation.
As with the two earlier conversations, this recorded conversation is preceded by the same
prerecorded warning: "This call originates from a Connecticut Department of Corrections
Facility and may be recorded or monitored."

On March 29, 2005, and April 6, 2005, stenciled on the wall behind both phone
stations 13 and 14 was the identical warning: "Any conversation including the number
being called, utilizing these telephones shall be subject to recording and listening." The
positioning and wording of the warning for each phone station is depicted on pages
three and four of Exhibit # 8, received into evidence.

## CONCLUSIONS OF LAW

### A,     Suppression of Statements

The defendant argues that any statements he made to the police on March 2, 2005,
and March 8, 2005, must be suppressed, since such statements "were taken involuntarily,
or in violation of the defendant's right to counsel or right to remain silent, or otherwise in
violation of the defendant's constitutional rights," and that "such statements were also
seized in violation of the Fourth Amendment of the United States Constitution and the
Constitution and laws of this [sic] Connecticut . . . ." (Factual Allegations and Legal
Authority in Support of Defendant's Motions, ¶¶ 120, 122.)

It is, of course, well settled that the Government may not use any statements
obtained from a defendant, whether exculpatory or inculpatory, which were the product of
custodial interrogation, unless prior to any questioning the defendant was advised of his
constitutional rights and knowingly, intelligently and voluntarily waived such rights. *Miranda
v. Arizona*, 384 U.S. 436 (1966); *Colorado v. Spring*, 479 U.S. 564 (1987); *Edwards v.*

*Arizona*, 451 U.S. 477 (1981).  However, in order for a defendant  to invoke the *Miranda*

protections, both a  custodial situation and official interrogation are required. *Alexander v.*

*State of Conn.*,  917 F.2d 747, 750 -51 (2d Cir. 1990).

As to the former requirement, in determining whether a defendant is in custody for

*Miranda* purposes, "the ultimate inquiry is simply whether there [was] a formal arrest or

restraint  of  freedom  of  movement  of  the  degree  associated  with  a  formal  arrest."

*California v. Beheler*, 463 U.S. 1121, 1125 (1983). As the Second Circuit has explained:

> The test for custody is an objective one: "whether a reasonable person in
> defendant's position would have understood himself to be subjected to the
> restraints comparable to those associated with a formal arrest." *United*
> *States v. Ali*, 68 F.3d 1468, 1472 (2d Cir. 1995) (internal quotation marks
> omitted). Focusing on this objective standard has the advantage–certainly
> from the perspective of the hundreds of thousands of law enforcement
> officers who must daily apply *Miranda*–of establishing a regular course of
> procedure. It does not require officers to administer *Miranda* warnings based
> on a self-assessment of their actions as "coercive"; rather, it instructs them
> to administer warnings whenever they place a person under formal arrest or
> apply restraints generally understood as comparable to those of a formal
> arrest.
>
> In *Tankleff v. Senkowski*, we acknowledged *Beheler's* focus on arrest-like
> restraints, but identified this as the first prong of a *Miranda* custody
> determination, to be followed by a free-to-leave inquiry, suggesting that the
> latter was determinative. *See* 135 F.3d at 243-44; see also *Parsad v.*
> *Greiner*, 337 F.3d at 181-82 (indicating that *Miranda* custody turned on
> whether a reasonable person would have felt free to terminate the
> interrogation and leave, with no mention of arrest or arrest-like restraints);
> *United States v. Badmus*, 325 F.3d 133, 138 (2d Cir. 2003) (same).
> Reversing the order and weight of the *Tankleff* inquiries would avoid the
> over-inclusion concerns noted in *Cruz* and by the district court. Doing so
> would also be consistent with *Thompson v. Keohane*, 516 U.S. at 112, 116
> S. Ct. 457, where the Supreme Court highlighted the free-to-leave inquiry as
> an essential component of "in custody" determination, but then reiterated that
> "the ultimate inquiry" is the arrest/arrest-like restraint test established by
> *California v. Beheler*, 463 U.S. at 1125, 103 S. Ct. 3517.
>
> As the district court recognized, a free-to-leave inquiry reveals only whether
> the person questioned was seized. *See generally Michigan v. Chesternut*,

486 U.S. 567, 573, 108 S. Ct. 1975, 100 L. Ed. 2d 565 (1988) (citing approvingly the test for seizure articulated in *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980) (opinion of Stewart, J.,  joined by Rehnquist, J.) (noting that Fourth Amendment "seizure" occurs "only if, in view of all the circumstances . . ., a reasonable person would have believed that he was not free to leave")); *accord United States v. Peterson*, 100 F.3d 7, 10 (2d Cir. 1996). Because seizure is a necessary prerequisite to *Miranda, see, e.g., Oregon v. Mathiason*, 429 U.S. at 495, 97 S. Ct. 711; *California v. Beheler,* 463 U.S. at 1123-24, 103 S.Ct. 3517, however, it makes sense for a court to begin any custody analysis by asking whether a reasonable person would have thought he was free to leave the police encounter at issue. If the answer is yes, the *Miranda* inquiry is at an end; the challenged interrogation did not require advice of rights. On the other hand, if a reasonable person would not have thought himself free to leave, additional analysis is required because, as *Berkemer v. McCarty*, 468 U.S. at 439-40, 104 S.Ct. 3138, instructs, not every seizure constitutes custody for purposes of *Miranda. Cf. Posr v. Doherty*, 944 F.2d 91, 98 (2d Cir.1991) ("[I]t is not enough to say a person has been arrested simply because, due to police action, he reasonably believes he is not free to leave."). In such cases, a court must ask whether, in addition to not feeling free to leave, a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest. *See California v. Beheler*, 463 U.S. at 1125, 103 S.Ct. 3517; *see also Stansbury v. California*, 511 U.S. at 322, 114 S.Ct. 1526. Only if the answer to this second question is yes was the person " 'in custody' for practical purposes," and "entitled to the full panoply of protections prescribed by *Miranda."* *Berkemer v. McCarty*, 468 U.S. at 440, 104 S. Ct. 3138.

*United States v. Newton*,  369 F.3d 659, 671-72 (2d Cir. 2004). Consequently, a defendant's subjective belief that he was not free to leave is irrelevant; rather, the question is what a reasonable person would have believed. *United States v. Kirsteins*, 906 F.2d 919, 923 (2d Cir. 1990). Moreover, the fact that a defendant may have been the focus of an investigation does not require that he be given *Miranda* warnings if he is not in custody. *Beckwith v. United States*, 425 U.S. 341, 347 (1976). In that regard, a defendant who voluntarily comes to a police station for questioning is not, without more, in custody. *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977); *United States v. Mussaleen*, 35 F.3d 692, 697 (2d Cir. 1994). "Moreover, absent an arrest, interrogation in the familiar surroundings

of one's own home is generally not deemed custodial." *United States. v. Newton*, 369 F.3d

at 675. In any event:

> A court evaluating whether a person is in custody for Miranda purposes must consider "the circumstances surrounding the interrogation; and ... [whether] given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave."

*United States v. Romaszko*, 253 F.3d 757, 760 (2d Cir. 2001) (quoting *Thompson v.*

*Keohane*, 516 U.S. 99, 112 (1995)).

Additionally, apart from the issue of custody,  it is well settled that any statement of

a defendant must be voluntary based on the "totality of the circumstances."   *Miller v.*

*Fenton*, 474 U.S. 104, 112 (1985).  A statement is not voluntary if it is obtained by any type

of physical or psychological coercion or by improper inducement so that a defendant's will

was overborne.  *Hayes v.  State of Washington*, 373 U.S. 503, 513-14 (1963).

The government bears the burden of proving by a preponderance of the evidence

both, that in the absence of *Miranda* warnings, and that the interrogation of a defendant

was non-custodial, and that any statements that he made were voluntary.   *Lego v.*

*Twomey*, 404 U.S. 477, 482-89 (1972).

## 1.    March 2, 2005

The Court concludes that the Government has established by a preponderance that

with respect to the first step in the *Newton* analysis, a reasonable person in the defendant's

position "would have thought he was free to leave the police encounter at issue," and,

consequently that the defendant was not in custody when McGlynn and Buglioni

interviewed him on March 2, 2005. *United States v. Newton*, 369 F.3d at 672. In reaching

its conclusion as to the non-custodial nature of the interview,  the Court specifically relies

on the following circumstances as set forth in its findings of fact.  McGlynn and  Buglioni, who were in plain clothes, driving an unmarked car, knocked on the door to the defendant's residence at about 9:00 p.m., and were invited inside by the defendant's mother, Botono. McGlynn and Buglioni first identified themselves to Botono and again to the defendant and Perrone.  Then, in the presence of Botono and Perrone, McGlynn and  Buglioni asked the defendant if they could speak to him. The defendant agreed and spoke to McGlynn and Buglioni for approximately thirty minutes while seated at his kitchen table. After they finished their conversation with the defendant, McGlynn and  Buglioni shook his hand, thanked him, and handed him a business card and told him if he had any other information or learned anything to contact the number on the card. At no time while they were in the defendant's residence did McGlynn or  Buglioni ever threaten him, pat him down, handcuff him or restrict his movement in any way. Moreover, the defendant never indicated that he wanted an attorney or did not want to speak to McGlynn or  Buglioni.

Additionally, the Court concludes that the Government has established, by a preponderance of evidence based upon the totality of the circumstances, that the statements the defendant made to McGlynn and Buglioni on March 2, 2005, were voluntary. In that regard, the Court finds that such statements were not obtained by any type of physical or psychological coercion or by any type of improper inducement. McGlynn and Buglioni did not threaten the defendant, or make him any promises to get him to talk. Moreover, the defendant did not appear to be under the influence of alcohol or drugs when McGlynn and Buglioni spoke to him, nor did the defendant ever indicate that he did not want to speak to the officers. Rather, he was cooperative and responded to the questions asked.

## 2.    March 8, 2005

As to statements made to Twohill and Buglioni on March 8, 2005, including the written statement introduced as Exhibit # 1, the Court concludes that the Government has established by a preponderance of evidence that a reasonable person would have thought he was free to terminate the interview at any point and leave, and that, even assuming, *arguendo* this was not the case, that a reasonable person  would not have believed his freedom of action to have been curtailed to a degree associated with formal arrest. Therefore, the Court concludes that the Government has met its burden in demonstrating that the defendant was not in custody on March 8, 2005. In reaching its conclusion, the Court has considered the circumstances of the defendant's March 8, 2005 police encounter, and more specifically relies on the following facts as found above.  Twohill and Buglioni arrived at the defendant's  residence at about 12:00 p.m., dressed in plain clothes, driving an unmarked police vehicle, and while both were armed, neither one's firearm was visible. Twohill and Buglioni, knocked on the door, which was answered  by the defendant. After explaining to him that they wanted to speak to him further concerning the disappearance of Argersinger at a more private location and suggesting  the Deep River Resident Trooper's Office, and after Twohill told the defendant that he did not have to go, the defendant agreed to accompany them. The defendant accompanied Twohill and Buglioni in their Dodge Intrepid, and was not handcuffed or restrained in any fashion. Upon their arrival at the Deep River Resident Trooper's Office, they sat around a desk for a few minutes, and before speaking further about the disappearance of Argersinger, Twohill asked the defendant if he would be willing to go to Troop F, since officers there were speaking to Howenstine and they would then be all together instead of having to

communicate by phone, and also since the Town Hall was noisier that anticipated. The defendant agreed to do so.

Once they arrived at Troop F, Twohill, Buglioni, and the defendant went to Twohill's office in the Detective Division on the second floor. At no time was the defendant patted down or handcuffed, and he remained free to leave. After arriving inside his office, Twohill specifically told the defendant that he was not under arrest. The defendant then volunteered that he was involved in the whole mess and wanted to tell his side of the story. Twohill responded by indicating to the defendant that, if he wanted, he could use the phone in the office to call attorney or that if he did not know who to call, he could use the telephone book to look someone up. The defendant declined to call an attorney. During the ensuing interview, a written statement (Exhibit # 1) was obtained from the defendant. After the statement was completed, Twohill let the defendant use his cell phone, so he could call Perrone. Twohill then drove the defendant home. While at F Troop, the defendant was allowed to use the bathroom on his own and was not accompanied by Twohill, Buglioni, or any other police officer.

Furthermore, the Court concludes that the Government has established, by a preponderance of evidence, that, based upon the totality of the circumstances, the statements that the defendant made to Twohill and Buglioni on March 8, 2005, including the written statement, were voluntary. In that regard, the Court finds that such statements were not obtained by any type of physical or psychological coercion or by any type of improper inducement. Twohill and Buglioni did not threaten the defendant or make him any promises to get him to talk. Moreover, the defendant did not appear to be under the influence of alcohol or drugs when Twohill and Buglioni spoke to him, nor did the defendant

ever indicate that he did not want to speak to the officers. Rather, he was cooperative and responded to the questions asked. He in fact volunteered to Twohill and Buglioni that he was involved in the whole mess and wanted to tell his side of the story. Further, while he was with Twohill and Buglioni for only about three hours on March 8, 2005, he was given something to eat and drink, and was permitted to use the bathroom when needed.

## B.    Suppression of Recorded Inmate Telephone Calls

The defendant maintains that "such recordings were made in the absence of warrant, or consent, or any other authority justifying such interception." (Factual Allegations and Legal Authority in Support of Defendant's Motions ¶ 126.)   However, the Court disagrees.

In *United States v. Workman*, 80 F3d 688 (2d Cir. 1996), the Second Circuit explained the circumstances under which inmate telephone conversations could be monitored and recorded:

> We have long recognized that, under certain circumstances, prisoners are deemed to have given consent for purposes of Title III to the interception of their calls on institutional telephones. See *United States v. Willoughby*, 860 F.2d 15, 19-20 (2d Cir.1988), *cert. denied*, 488 U.S. 1033, 109 S. Ct. 846, 102 L. Ed. 2d 978 (1989); Amen, 831 F.2d at 378-79.

> In *Amen,* we held that inmates impliedly consent to have their telephone conversations monitored where they have received notice of the surveillance and nevertheless use the prison telephones. 831 F.2d at 378-79. The notice in that case consisted of federal prison regulations clearly indicating that inmate telephone calls were subject to monitoring, an orientation lecture in which the monitoring and taping system was discussed, an informational handbook received by every inmate describing the system, and signs near the telephones notifying inmates of the monitoring. *Id.* Similarly, we held in *Willoughby* that a combination of notification at an orientation lecture and signs near the telephones explaining the policy was sufficient to justify the inference of consent by prisoners who used the phones. *Willoughby*, 860 F.2d at 20. [FN2]

FN2. In *Willoughby*, the inmate also expressly agreed to be monitored by signing a consent form. 860 F.2d at 20. However, we made clear that use of the telephones in any event constituted implied consent, given the orientation lecture and the notification sign near the telephone. *Id.*

*Id.* at 693. Here the Court concludes that the Government has proven by a preponderance of evidence, in accordance with *Workman* and contrary to the defendant's argument*,* that the defendant did in fact consent to have his conversations monitored and recorded prior to the collect calls of March 15, 2005, March 29, 2005, and April 6, 2005. In that regard, the Court finds that by signing the "Inmate Telephone System Enrollment Form" at Hartford on March 10, 2005, and the "Notification and Acknowledgement for Inmates" at MacDougal-Walker on March 16, 2005, he explicitly consented to have his collect call telephone conversations monitored and recorded. *United States v. Willoughby*, 860 F.2d 15, 20 (2d Cir.1988), *cert. denied*, 488 U.S. 1033 (1989). Moreover, the Court finds, as to the March 15, 2005, telephone conversation, that the defendant impliedly consented to its monitoring and recording, since it was preceded by the warning, "This call originates from a Connecticut Department of Corrections Facility and may be recorded or monitored." Regarding the calls of March 29, 2005, and April 6, 2005, the defendant impliedly gave his consent that they be monitored and recorded, since they were preceded by the identical warning. Additionally, as to these two calls, prior to making them, the defendant had received an inmate handbook stating, "Recording and Listening Your telephone conversations are subject to being recorded and listened to. Conversations that violate state regulations may be the basis of criminal or disciplinary action." Further, the wall at the station where the defendant placed the call on March 29, 2005, as well as the wall at the station where the defendant placed the call on April 6, 2005, bore the warning, "Any

conversation including the number being called, utilizing these telephones shall be subject to recording and listening."

To the extent the defendant argues that the telephone conversations at issue are not admissible against him, since Administrative Directive 10.7 did "not grant authority to monitor and record inmate conversations unrelated to 'maintenance of the security, good order or discipline of the facility or the prevention of criminal activity either within the facility or without,'" (Post-Hearing Arguments and Legal of Defendant's Motions at 5), the Court disagrees. Even assuming, *arguendo,* that the calls were monitored and recorded in violation of Administrative Directive 10.7, suppression is not required. Confronted with an argument that state prison officials recorded telephone conversations in violation of an inmate's state constitutional rights, the Circuit held:

> Rodgers also argues that the telephone recordings made by state prison officials, even if not in violation of the Fourth Amendment, constituted an abrogation of his rights under parallel provisions of the New York State Constitution, and that this evidence should therefore have been suppressed. *See* N.Y. Const. art. I, § 12 (guaranteeing "[t]he right of the people to be secure against unreasonable interception of telephone ... communications"). We have no need to determine whether Rodgers has properly construed the State Constitution. Even if he is correct in his interpretation, and we are aware of no authority to this effect, the district court's decision to admit the recordings was nevertheless proper.
>
> We confronted a similar question in *United States v. Pforzheimer*, 826 F.2d 200 (2d Cir. 1987). In that case, a defendant argued that the fruits of a search conducted by state officials pursuant to a state court warrant should be suppressed in a federal prosecution where a more stringent state constitutional rule would have required suppression, even though the evidence was admissible as a matter of federal constitutional law. Without passing on the merits of the state constitutional question, we ruled the evidence admissible, holding that where evidence seized by state officers is subsequently offered in a federal criminal proceeding, the seizure need not satisfy state law requirements. *Id.* at 204; *see United States v. Smith*, 9 F.3d 1007, 1014 (2d Cir. 1993) ("touchstone of a federal court's review of a state search warrant secured by local police officials and employed in a federal

prosecution is the Fourth Amendment and its requirements, and no more"); *United States v. Rowell*, 903 F.2d 899, 901-02 (2d Cir. 1990). *Cf. United States v. Brown,* 52 F.3d 415, 426-27 (2d Cir.1995) (Leval, J., concurring), *cert. denied*, 516 U.S. 1068, 116 S.Ct. 754, 133 L.Ed.2d 701 (1996).

This case is analogous. Rodgers argues that evidence procured by a state official should be excluded from a federal prosecution if the state official failed to conform to state constitutional standards. There is no such requirement for admissibility of evidence in a federal criminal prosecution. *See United States v. Butera,* 677 F.2d 1376, 1380 (11th Cir. 1982) (tape recordings properly made by state officials pursuant to consent provisions of Title III, 18 U.S.C. § 2511(2)(c), admissible in federal prosecution even where state constitutional law would have required warrant), *cert. denied*, 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 958 (1983); *United States v. Nelligan*, 573 F.2d 251, 253 (5th Cir. 1978) (tape recording of conversation made with consent of one party in compliance with Title III admissible in federal prosecution despite state statute requiring consent of all parties to conversation).

*United States v. Workman,*   80 F.3d at 694 -695.

## CONCLUSION

Accordingly, the defendant's motion to suppress statements (Docket # 177)

is denied in all respects.

It Is So Ordered.

DATED:        October 25, 2007
                      Rochester, New York

                                        ENTER.

_____    /s/ Charles J. Siragusa_____
                                        CHARLES J. SIRAGUSA
                                        United States District Judge